DAVID W. RIZK – CABN # 284376
RIZK & SHEARER LLP
466 Geary Street, Suite 201
San Francisco, CA 94102
Telephone: (415) 517-9044
Email: drizk@rs-llp.com

Counsel for Defendant COVINGTON

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ZANE ISHMAEL COVINGTON,<br>Defendant. | **Case No.:** CR 25-00363 JST<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**REDACTED**<br><br>**Court:** Courtroom 6, 2nd Floor<br>**Hearing Date:** September 25, 2026<br>**Hearing Time:** 1:30 p.m. |

## I. INTRODUCTION

Defendant Zane Covington is before the Court for sentencing on a plea agreement entered under Rule 11(c)(1)(C). Mr. Covington pleaded guilty to all counts of the Indictment: two counts of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and (e); one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2); and one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2). Presentence Report (PSR) ¶¶ 2–3. The parties jointly recommend a sentence of 300 months—twenty-five years—followed by ten years of supervised release. *Id.* ¶ 4. That is the mandatory minimum term Congress prescribed for the production counts. 18 U.S.C. § 2251(e); *Id.* ¶ 130. U.S. Probation recommends five years *more*, despite Mr. Covington's age and health. *Id.*, Sentencing Recommendation at 3. The defense

respectfully asks the Court to accept the parties' agreement and to impose the negotiated sentence.

Mr. Covington does not minimize the offenses he committed. He abused two children who were entrusted to him and recorded it, and he secretly collected similar material online. To his credit, he has sought to mitigate the harm he caused and streamlined these proceedings to accept the consequences for his conduct. He waived a detention hearing, accepted responsibility, cooperated with the probation officer, and has told his family that he appreciates he must be punished. PSR ¶¶ 6, 28, 62–63. Although the defense understands the impulse to impose a maximal penalty, no greater punishment will undo or even further mitigate the harm instanced by Mr. Covington.

Sadly, Mr. Covington himself was also harmed as a child. [redacted] *Id.* He began drinking and using marijuana at twelve and methamphetamine at thirteen and has only managed sobriety while incarcerated. *Id.* ¶¶ 122–123.

[redacted] "the abuse he endured and his subsequent addiction to drugs and alcohol were drivers for his conduct in this case and in his prior sex offense." *Id.* ¶ 114. She added that he "needs treatment and help in managing his emotions and processing what happened as he has never worked through it." *Id.* That is not an excuse, of course, and Mr. Covington does not offer it as one. Rather, it is an explanation of the trauma and the condition that has, in his own words, "ruined" Mr. Covington's life. It is also an explanation that the record amply supports. U.S. Probation itself invites the Court to consider "his traumatic upbringing being sexually abused at an incredibly young age"

and "his history of substance abuse beginning at a very young age." *Id.* ¶ 154.

Now, Mr. Covington is fifty-four years old and in deteriorating health. PSR ¶¶ 115–119. A 2022 automobile accident left him with lumbar discitis, vertebral osteomyelitis, an epidural abscess, bacteremia, and sepsis; imaging shows permanent structural damage, including vertebral endplate erosion, disc collapse, and severe spinal stenosis. *Id.* ¶ 118. The legal nurse consultant who reviewed Mr. Covington's medical records concluded that his limitations "are expected to worsen with age," that it is "medically realistic that he will need increasing assistance to get around, including the use of a walker or wheelchair," and that bathing, dressing, using the bathroom, and getting to meals "may become difficult or impossible to manage independently." *Id.* ¶ 119.

Mr. Covington was arrested on October 1, 2025, waived detention, and has been in continuous custody since. *Id.* ¶¶ 6, 102. Imposition of the negotiated sentence means Mr. Covington will be released in his late seventies, as he is statutorily ineligible to earn First Step Act time credits because of the instant convictions. *See* 18 U.S.C. § 3632(d)(4)(D). Mr. Covington's own father died at seventy-nine. The agreed sentence is, realistically, the balance of his life. Against that backdrop, the additional sixty months U.S. Probation recommends is unnecessary and excessive. The parties negotiated the sentence with full knowledge of the offense conduct, the victim impact, and Mr. Covington's prior convictions. The defense respectfully submits that, balancing the interests enumerated in the sentencing statute as well as its command to impose a sentence "sufficient, but not greater than necessary," the negotiated sentence is sufficient here.

## II. BACKGROUND

Mr. Covington was born in 1972, to James Covington and Vivian Spicer. PSR ¶ 103. His father was Black and his mother is white, and the family was harassed regularly in Livermore, where they lived, because of it. *Id.* ¶ 104. Zane himself was bullied; their property was vandalized; on one occasion, someone put multiple bullet holes in his father's vehicle. *Id.*

Mr. Covington's father served in the military, in Korea and in Vietnam, and was "militant in the home when it came to discipline." PSR ¶ 105; Def. Inv. of Zane Covington (Feb. 24, 2026). After his service in the military, he worked as a federal prison guard at FCI Dublin and FCI Victorville. PSR ¶ [redacted]

[redacted] The practical consequence was that Mr. Covington's older sister, Tamara White, raised him. PSR ¶ 105. She got him up for school, made them both breakfast, and walked them to school. *Id.* ¶ 114; Def. Inv. of Tamara Covington (Feb. 24, 2026).

[redacted]

[redacted]

School offered no refuge. Mr. Covington was physically assaulted by other students on his first

day of kindergarten, and his sister came to his defense. PSR ¶ 108. He was bullied for years because of his mixed-race parents—called names, hit, and pushed. *Id.*; Def. Inv. of Tamara Covington (Mar. 18, 2026). His sister attended the same school and intervened when she could, until she moved on to middle school and could no longer protect him. Def. Inv. of Tamara Covington (Mar. 18, 2026). There were only about ten Black children at their school in Livermore, and they knew one another. *Id.* (Feb. 24, 2026).

Mr. Covington was eleven years old when his parents separated, and the separation devastated him. PSR ¶ 104; Def. Inv. of Zane Covington (Mar. 10, 2026). He missed his father badly. Def. Inv. of Zane Covington (Feb. 24, 2026). He watched his mother cry through the day, playing one song on a continuous loop, for what he recalls as years. *Id.* (Mar. 10, 2026). And he learned something that shaped the rest of his life: when he misbehaved and got into trouble, his father would come and see him. *Id.* (Feb. 24, 2026). So he got into trouble more often. Id.

He also began to drink. Mr. Covington started using alcohol and marijuana at twelve and methamphetamine at thirteen, and used alcohol, marijuana, and methamphetamine daily until his arrest in this case. PSR ¶ 122. Alcohol was freely available to him at home, at friends' houses, and around town. Def. Inv. of Tamara Covington (Mar. 18, 2026). He has been sober only during periods of incarceration or inpatient treatment. PSR ¶ 123. As Mr. Covington explained it, he used methamphetamine in the mornings to have the energy to work and drank at night to get to sleep; without alcohol, the nightmares came. Def. Inv. of Zane Covington (Mar. 10, 2026). In custody now, sober and unable to self-medicate, Mr. Covington relates that his nights are filled with "haunting scenes from his childhood." *Id.* As noted above, he has never been afforded mental health treatment or therapy. *Id.* His only experience of structured mental health support was a group for offenders that he attended after his prior conviction. *Id.*

Mr. Covington's personal qualities and interests are not reflected in his criminal history or the other filings before the Court. Although Mr. Covington has lived a hard life in many respects, he is also remarkably sensitive, caring, and joyous. For example, music, reading, and movies have always been important to Mr. Covington. He loves science-fiction, comics, and movies, and has read many of the classic sci-fi series. He also has enjoyed a lifelong love of music, and even as an adult, has

always played in rock and punk bands. During his childhood he was drawn to music, learned to play drums, and eventually studied music theory and composition. Def. Inv. of Zane Covington (Feb. 24, 2026). Creativity is important to him. Another example: a neighbor who owned a jewelry store took him on as a teenager, recognized his ability, and paid for him to attend jewelry-making classes, where he excelled. *Id.* As a young man, he loved skateboarding and snowboarding.

Mr. Covington did not graduate from high school, but earned his GED in custody. He earned high scores in science subjects and later completed roughly forty college credits during the service of his state sentence. PSR ¶ 124; Def. Inv. of Zane Covington (Mar. 10, 2026). For most of his life, he found steady employment in construction and remodeling, working for a company called UHC, as well as independently on his own as a carpenter and jack-of-all-trades. Mr. Covington built his mother's bathroom and remodeled a room in her house. PSR ¶ 125; Def. Inv. of Zane Covington (Feb. 24, 2026); Def. Inv. of Tamara Covington (Feb. 24, 2026). Decades of construction work, together with three automobile accidents, are the source of the chronic pain he now lives with. Def. Inv. of Zane Covington (Feb. 24, 2026); Def. Inv. of Tamara Covington (Mar. 20, 2026).

The people who know Mr. Covington describe a man who shows up. When Eugene Urenda, a friend of fifteen years who uses a wheelchair, could not finish repairs in his mother's backyard, he called Mr. Covington, who arrived within the hour on his bicycle and finished the job. Def. Inv. of Eugene Urenda (Mar. 11, 2026). Mr. Covington repaired the floors of Mr. Urenda's mother's and grandmother's trailers. *Id.* When Mr. Urenda was at risk of losing custody of his son, Mr. Covington counseled him to follow the court's instructions to the letter; Mr. Urenda did, and kept custody, and credits Mr. Covington's advice. *Id.* Mr. Covington has volunteered his time to move furniture, perform repairs, and yardwork, Def. Inv. of Tony Moore (Mar. 19, 2026), and assisted another friend with a disability by building a ramp at his home. Def. Inv. of Kayla Covington (Mar. 9, 2026).

Mr. Covington has also absorbed a great deal of loss. His father died of colon cancer in 2009, at seventy-nine. PSR ¶ 103; Def. Inv. of Zane Covington (Feb. 24, 2026). The harder loss was his nephew James. Mr. Covington helped raise James, taught him to tie his shoes, and loved him as a son; people who saw them together assumed James was his. Def. Inv. of Zane Covington (Feb. 24, 2026); Def. Inv. of Tamara Covington and Vivian Spicer (Mar. 10, 2026); PSR ¶ 111. In December

2020, James died of a fentanyl overdose at the school where he worked as a night janitor. PSR ¶ 111. The night he died, Mr. Covington went to the school and checked door after door looking for him; by the time police found James, it was too late. Def. Inv. of Zane Covington (Mar. 10, 2026). Mr. Covington blamed himself for the death because it was his own son Tyler—who had been living in James's house—who had exposed James to fentanyl. Def. Inv. of Tamara Covington (Feb. 24, 2026). His sister's assessment is that Mr. Covington had been making efforts to improve himself until James died, and that afterward "it was too much for him, and he increased his drug use." *Id.* James's two children, now sixteen and eighteen, went to live with Mr. Covington's sister. PSR ¶ 111.

Mr. Covington's relationships with his own children have run in opposite directions. His son Tyler, twenty-nine years old, is addicted to fentanyl. *Id.* Mr. Covington had a difficult relationship with him and went for long periods without speaking to him. *Id*. His daughter Kayla, twenty-five, describes a father who was present for as long as she can remember, who took her to the movies dressed up in their best clothes, who taught her to play the drums and waited impatiently for her twenty-first birthday so she could come to his shows. Def. Inv. of Kayla Covington (Mar. 9, 2026). She, her mother, and Mr. Covington's sister visit him weekly in custody. PSR ¶ 111. She and her father speak by phone every two or three days and she writes him letters. Def. Inv. of Kayla Covington (Mar. 9, 2026).

Mr. Covington's health is poor and getting worse. He previously shattered his shoulder and could not afford the surgery, so the bone healed misaligned; he has had arthroscopic surgery on his knee and elbow, needs a total knee replacement he cannot obtain, and receives steroid injections in his knee, elbow, and back. PSR ¶¶ 116–117; Def. Inv. of Zane Covington (Mar. 10, 2026). Following a 2022 automobile accident he was hospitalized and then placed in a skilled nursing facility, diagnosed with lumbar discitis, vertebral osteomyelitis, an epidural abscess, bacteremia, and sepsis. PSR ¶ 118. Although the infection resolved, "imaging showed permanent structural damage, including vertebral endplate erosion, disc collapse, and severe spinal stenosis at prior infection sites." *Id.* He also has a documented history of GERD, prediabetes, carpal tunnel syndrome, dental decay, anxiety, depression, and insomnia, "all of which remain ongoing chronic conditions managed intermittently with medication and supportive care." *Id.*

The legal nurse consultant who reviewed Mr. Covington's medical records reached a conclusion the Court should have squarely in view:

> His orthopedic and spinal limitations significantly restrict mobility and daily functioning and are expected to worsen with age. The burden of chronic pain, declining physical capacity, and increasing medical dependence is likely to intensify over time in a correctional setting. In my professional opinion as a legal nurse consultant, Z.C.'s long-term medical prognosis is uncertain, but the record clearly demonstrates permanent disability and progressive disease. As these conditions progress, it is medically realistic that he will need increasing assistance to get around, including the use of a walker or wheelchair. If his mobility becomes more limited, everyday tasks such as bathing, dressing, using the bathroom, getting to meals, and keeping medical appointments may become difficult or impossible to manage independently. Limited mobility also increases the risk of falls, physical deconditioning, worsening pain, skin breakdown, and general decline. In a correctional setting, these limitations often lead to dependence on others for basic care and reduced access to timely medical treatment.

PSR ¶ 119. Mr. Covington's family history compounds the risk: his father died of colon cancer, as did his maternal grandfather and his maternal uncle, and although the family was warned by his father's physician to undergo early and regular screening, Mr. Covington has never been screened. Def. Inv. of Tamara Covington (Mar. 20, 2026).

By comparison, Mr. Covington's mental health record is relatively thin. Mr. Covington has previously been prescribed antidepressants but received minimal other treatment. PSR ¶ 120. He has called the suicide hotline multiple times, held a knife to his own throat, and driven at night on the freeway against traffic, telling himself that if he reached a certain exit he would get off. Id. ¶¶ 110, 120. On the Adverse Childhood Experiences assessment administered by the probation officer, he scored six out of ten. Id. ¶ 121. It is profoundly sad that Mr. Covington did not receive the support and treatment he needed starting much earlier in life.

On Mr. Covington's own account and by every outward sign, he is remorseful. He told a defense investigator in their first meeting that he feels very remorseful for what he did, acknowledges that he must take responsibility for it, and wishes he had made different choices. Def. Inv. of Zane Covington (Feb. 24, 2026). He said in a later meeting that he believes he deserves punishment. *Id.* (Mar. 10, 2026). What he says he can hardly bear is that he may never see his grandchildren again. *Id.* His friends have fallen away since the case appeared in the news, and he understands why. *Id.* (Mar. 18, 2026); Def. Inv. of Tamara Covington (Feb. 24, 2026). He is sober for the first time in

decades and reports that he can think more clearly. Def. Inv. of Zane Covington (Mar. 10, 2026). He hopes to earn additional college credits in prison, to continue with music programs, and to counsel other men who have been through what he has been through. PSR ¶ 113.

## III. PRESENTENCE REPORT & GUIDELINES

The parties stand by the Guideline calculation set forth in the plea agreement as the appropriate calculation given the circumstances of this case. In particular, the government and the defense therefore both object to the five-level "pattern of activity" enhancement the probation officer applied under U.S.S.G. § 2G2.2(b)(5). PSR ¶ 35; PSR, Add. at 1. The parties' agreed calculation, set out in Paragraph 7 of the Plea Agreement, does not include it and yields a Total Offense Level (TOL) of 39. The defense preserves the objection because the calculation reflected in the plea agreement is the one the parties bargained for, and because the probation officer's reliance on the enhancement carries into the recommendation of a sentence that is sixty months above the parties' agreed term.

Even under the parties' lower Guideline calculation associated with TOL 39 and CHC V, there is agreement between the United States and Mr. Covington that the resulting range of 360 months to life would be excessive for this case. Adding a further enhancement under 2G2.2(b)(5), as the Probation Officer does, drives the theoretical sentencing exposure off the Sentencing Table entirely, undermining the validity and usefulness of the Guidelines as a sentencing tool in the first place.

Notably, even without the enhancement, Mr. Covington is already subject to maximal punishment under the relevant statutes and the Guidelines as a result of his "pattern" or record of repeated problems with child sexual abuse. First, of course, the mandatory minimum penalties of up to twenty-five years applicable in this case are significantly increased due to his prior conviction. 18 U.S.C. §§ 2251(e), 2252(a)(2), (b)(2). Second, his Criminal History Category (CHC) score also reflects three points for his prior conviction, which increases his Category from IV to V. Tertiary-level punishment in the form of a 5-level enhancement for the same conduct, even after he served a long sentence for it and is already punished more severely on statutory and Guidelines grounds, is unnecessarily punitive; for the reasons set forth below, a downward variance to the negotiated sentence proposed by the parties is appropriate instead.

//

## IV. ARGUMENT

Courts have an overarching obligation to impose sentences that are sufficient but not greater than necessary to achieve the goals of 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Although they provide a starting point and should be respectfully considered, the Guidelines are not mandatory and should not be accorded more weight than the other section 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). Importantly, not only are the Guidelines not mandatory, "they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam) (emphasis in original); *see also Rita v. United States*, 551 U.S. 338, 350–51 (2007). Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(1), (a)(4), (a)(6). In crafting a sentence that is "sufficient, but not greater than necessary," the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). The defense respectfully submits that the reasons set forth below under § 3553(a) amply justify the agreed sentence.

### A. The Circumstances of the Offense and Mr. Covington's Personal History.

There is no question that the offense in this case is among the most serious that come before the Court. Mr. Covington, by his own account and that of his family, was not doing well at the time, reeling from the death of his nephew, and using substances in a failed attempt to cope with his own trauma and abuse as a child. He harmed his victims and family and himself terribly. Mr. Covington, in joining the government in recommending this disposition, does not ask the Court to weigh those harms lightly. Instead, he asks the Court to recognize that the sentence the parties propose—twenty-five years in federal prison for a fifty-four-year-old man in failing health, followed by ten years of supervision with stringent conditions—is devastating and therefore at least commensurate to thse

harm he created.

Mr. Covington's decision-making during the pendency of this case has minimized further harm to the victims and their families. He was arrested on October 1, 2025, waived his detention hearing, and has remained in continuous federal custody since. PSR ¶¶ 6, 102. He did not file motions or challenge the status of his prior convictions as the predicate for the increased mandatory minimum penalties. Although he sought the government's agreement to a sentence between twenty and twenty-five years, when the U.S. Attorney's Office refused, he accepted the terms of the plea agreement the government had previously offered. Pursuant to the plea agreement, Mr. Covington then pleaded guilty to every count of the Indictment, including the two production counts. *Id.* ¶ 3. Thus, while his offense conduct was severe, he has also taken extraordinary steps during this process to quell the harm he created.

As to his history, Mr. Covington was a victim of sustained child sexual abuse, beginning at age three, [redacted] He received no counseling, no treatment, and no acknowledgment; the abuse was never reported, and his abuser was never held to account. *Id.* ¶ 107. He spent his adult life asking himself whether it was his fault and whether he deserved it. *Id.* He has never had individual therapy; the only mental health counseling he has received came incidentally, through substance abuse rehabilitation programs, and when he briefly attended a support group for offenders after his prior conviction. PSR ¶ 120; Def. Inv. of Zane Covington (Mar. 10, 2026). There is significant empirical evidence in studies of federal offenders correlating childhood sexual abuse with subsequent sexual offenses.[1]

Mr. Covington committed these crimes not because he wanted to hurt those around him, but

---

[1] Drury (U.S. Probation), et al., "Childhood sexual abuse is significantly associated with subsequent sexual offending: New evidence among federal correctional clients," Child Abuse & Neglect vol. 95 (2019), at 2, 7 ("There is not a one-to-one correspondence between CSA and later sexual offending, but CSA confers a significant risk for it."), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0145213419302121 (last accessed Apr. 9, 2026).

because he was himself deeply hurt to the point of dysfunction. His family confirmed that his own abuse, and use of drugs and alcohol to cope, were "drivers for his conduct in this case and in his prior sex offense." PSR ¶ 114. Again, the defense does not contend that any of this excuses the offense, nor that it entitles Mr. Covington to a sentence below the mandatory minimum, which is unavailable in any event. Instead, counsel respectfully submits a man whose own sexual victimization began before he could speak about it deserves some consideration and leniency.

**B. Just Punishment, Deterrence, and Public Safety.**

Twenty-five years is just punishment; indeed, it is equivalent to a sentence for a homicide offense. For Mr. Covington in particular, the agreed sentence is punishment of a severity the raw number understates. He is fifty-four and he will be in his late seventies when he is released, if he survives the sentence at all. He enters custody with serious health conditions and impairments that are slated to deteriorate significantly with time. PSR ¶¶ 118–119. U.S. Probation concedes "his physical condition will almost certainly be exacerbated by a lengthy prison term." PSR, Sentencing Recommendation at 2. A twenty-five-year sentence is, in realistic terms, the rest of Mr. Covington's life. The additional sixty months U.S. Probation recommends would add nothing to the punishment except marginally to the likelihood that he dies before it ends.

Mr. Covington is incapacitated and will remain so for a quarter century. If released he will be in his mid-to-late seventies, physically dependent, and subject to ten years of supervised release with extensive, intrusive conditions. He will continue to be subject to registration under the Sex Offender Registration and Notification Act—or whatever surveillance mechanisms may be in place decades from now. *Id.* at 3. Whatever risk Mr. Covington may have presented today, it will be diminished to nothing after twenty-five years; and at that point, an additional five-year increment at the far end of the sentence will not accomplish anything.

Deterrence, specific and general, is amply served by the parties' negotiated sentence. As an initial matter, it must be acknowledged that Mr. Covington's conduct was not the product of a rational calculation that could have been altered by sentencing considerations. It was the dysfunctional behavior of a man who had used methamphetamine and alcohol daily since adolescence, who had never received treatment for the sexual abuse he suffered as a small child, and

whose drug use escalated sharply after his nephew's overdose death. PSR ¶¶ 106–107, 122–123; Def. Inv. of Tamara Covington (Feb. 24, 2026). As for general deterrence, the empirical literature consistently finds that the certainty of apprehension and punishment, rather than the severity of the sentence, is what produces deterrent effect, and identifies no measurable marginal benefit from lengthening sentences that are already very long. *See, e.g.,* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199 (2013). A twenty-five-year federal sentence, followed by a decade of supervision and sex offender registration, communicates the seriousness of this conduct as forcefully as any sentence can.

**C. Educational, Vocational, Medical, and other Correctional Treatment.**

This factor favors the agreed sentence and supports several judicial recommendations. Mr. Covington has never received sex-offender-specific treatment, and he has never had individual therapy addressed to his own childhood sexual victimization; the counseling he has received came incidentally through substance abuse programs. PSR ¶ 120; Def. Inv. of Zane Covington (Mar. 10, 2026). He has never sustained sobriety outside of custody or inpatient treatment. PSR ¶ 123. He wants both. He also intends to continue his education—he completed roughly forty college credits during his state term, along with courses in life skills, leadership, nutrition, economics, algebra, and an eight-week victim impact course—and hopes to participate in music programming and to counsel other men who were abused as children. Id. ¶¶ 79, 113, 124. None of that requires thirty years rather than twenty-five. The probation officer has already recommended that the Court recommend Mr. Covington's participation in the Bureau of Prisons' sex offender specific treatment program and the Residential Drug Abuse Program, PSR, Sentencing Recommendation at 3, and the defense joins that recommendation. Mr. Covington also sincerely hopes, and asks the Court to recommend, that he may serve his sentence at a facility with a music program. He has found playing music to be therapeutic throughout his life, including during the hardest times.

Finally, the defense respectfully requests that the Court recommend to the Bureau of Prisons that Mr. Covington (1) be designated to a facility with a medical care level appropriate to his medical condition; (2) participate in the Bureau's sex offender specific treatment program; (3) participate in the Residential Drug Abuse Program; and (4) be designated to an institution as close to the San

Francisco Bay Area as his medical classification permits.[2]

**D. The Need to Avoid Unwarranted Disparities.**

Section 3553(a)(6) charges the Court with avoiding "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Again, counsel feels constrained to point out that the sentence contemplated here and required by the mandatory minimum is the equivalent of a homicide sentence. If anything, the sentence is too harsh, not too lenient as the probation officer seems to think.

The JSIN data in the PSR also does not suggest that the parties' negotiated sentence is disparate, PSR ¶ 149; rather, the agreed sentence is generally in line with the (mere) seven sentences reported nationally. Of course, the JSIN data reveals no information about the defendants' ages, health, or histories of victimization. The record here, including the record of Mr. Covington's own suffering, is sufficient to justify a twenty-five-year sentence against this backdrop.

**V. CONCLUSION**

For the reasons set forth above, Mr. Covington respectfully asks the Court to accept the parties' Rule 11(c)(1)(C) agreement. Mr. Covington further asks that the Court make the judicial recommendations to the Bureau of Prisons set forth above.

Dated: September 18, 2026

Respectfully submitted,

DAVID W. RIZK
RIZK & SHEARER LLP
Counsel to Mr. Covington

[2] Mr. Covington's mother is seventy-nine and suffers from various health conditions that preclude her from travelling long distances.